UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

No. 26-9548

CENTER FOR BIOLOGICAL DIVERSITY and SIERRA CLUB,

*Petitioners,*

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY and LEE ZELDIN, in his official capacity as U.S. Environmental Protection Agency Administrator,

*Respondents.*

STATE OF COLORADO,

*Respondent-Intervenor.*

On Petition for Review of Final Action of the U.S. Environmental Protection Agency (EPA Docket No. EPA-R08-OAR-2024-0622)

# PETITIONERS' OPENING BRIEF

Ryan Maher
Center for Biological Diversity
1411 K St. NW, Ste. 1300
Washington, DC 20005
781-325-6303
rmaher@biologicaldiversity.org
*Counsel for Petitioners*

Benjamin Rankin
Center for Biological Diversity
1411 K St. NW, Ste. 1300
Washington, DC 20005
202-849-8402
brankin@biologicaldiversity.org
*Counsel for Petitioners*

* Oral Argument Requested

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........ iii
GLOSSARY OF ACRONYMS AND ABBREVIATIONS ........ x
INTRODUCTION ........ 1
JURISDICTIONAL STATEMENT ........ 3
STANDING ........ 4
STATEMENT OF THE ISSUES ........ 8
STATEMENT OF THE CASE ........ 9
I. The Denver area's enduring ozone problem ........ 9
II. The Clean Air Act's strategy for addressing ozone pollution ........ 12
A. National Ambient Air Quality Standards ........ 12
B. State Implementation Plans ........ 14
C. Nonattainment area requirements ........ 16
D. Section 110(*l*) of the Act ........ 17
III. The Clean Air Act's "contingency measures" requirement ........ 18
IV. EPA and Colorado's repeated failure to attain the ozone NAAQS ........ 21
V. Ozone contingency measures for the Denver area ........ 22
VI. Rulemaking history ........ 26
STANDARD OF REVIEW ........ 27
SUMMARY OF THE ARGUMENT ........ 29
ARGUMENT ........ 31
I. EPA's approval of Colorado's contingency measure in reliance on non-statutory, standardless considerations of feasibility violates the Clean Air Act and is arbitrary ........ 31
A. EPA exceeded its authority under the Clean Air Act by premising its approval on considerations of feasibility. ........ 32
B. The Clean Air Act does not afford EPA discretion to consider feasibility for contingency measures. ........ 37
C. EPA's standardless considerations of feasibility demonstrate that the agency's interpretation contravenes the Clean Air Act. ........ 42
II. EPA's failure to analyze the NOx emissions increases resulting from Colorado's contingency measure violates Section 110(*l*) of the Act and is arbitrary. ........ 46

A. EPA violated Section 110(*l*) of the Clean Air Act by failing to analyze the increases in NOx pollution resulting from Colorado's contingency measure.......... 48

B. EPA failed to consider several important aspects of the problem resulting from the NOx increases in its application of the "wholistic impact" approach. .......... 55

III. Sections 172(c)(9) and 182(c)(9) do not condone a contingency measure that provides *de minimis* emissions reductions.......... 58

IV. Remedy .......... 60

CONCLUSION .......... 61

ORAL ARGUMENT STATEMENT .......... 62

CERTIFICATE OF SERVICE.......... 63

CERTIFICATE OF DIGITAL SUBMISSION .......... 63

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT.......... 64

ATTACHMENT 1: EPA Final Rule, 91 Fed. Reg. 17,857 (Apr. 9, 2026)

ATTACHMENT 2: Declaration of Jonathan Evans (Sept. 15, 2026)

ATTACHMENT 3: Declaration of Scott Silber (Sept. 17, 2026)

ATTACHMENT 4: Declaration of Jeremy Nichols (Sept. 15, 2026)

# TABLE OF AUTHORITIES

## CASES

*Alaska Dep't of Envtl. Conservation v. EPA*
540 U.S. 461 (2004) ........ 27
*Allen v. United Props. & Constr., Inc.*
2008 WL 4748511 (D. Colo. Oct. 28, 2008) ........ 9
*Am. Great Lakes Ports Ass'n v. Schultz*
962 F.3d 510 (D.C. Cir. 2020) ........ 60
*Ass 'n of lrritated Residents v. EPA*
10 F.4th 937 (9th Cir. 2021) ........ 19, 21
*Ass'n of Irritated Residents v. EPA*
790 F.3d 934 (9th Cir. 2015) ........ 14
*Bahr v. EPA*
836 F.3d 1218 (9th Cir. 2016) ........ 20
*Bd. of Cnty. Comm'rs of Weld Cnty. v. EPA*
72 F.4th 284 (D.C. Cir. 2023) ........ 12, 14, 17
*Border Power Plant Working Group v. DOE*
260 F. Supp. 2d 997 (S.D. Cal. 2003) ........ 56
*Catawba County v. EPA*
571 F.3d 20 (D.C. Cir. 2009) ........ 14, 57
*Cemex Inc. v. DOI*
560 F. Supp. 268 (D.D.C. 2021) ........ 60
*Center for Biological Diversity v. EPA*
129 F.4th 1266 (10th Cir. 2025) ........ 17, 49, 52
*Center for Biological Diversity v. EPA*
149 F.4th 1142 (10th Cir. 2025) ........ 12
*Center for Biological Diversity v. EPA*
75 F.4th 174 (3d Cir. 2023) ........ 17, 52
*Center for Biological Diversity v. EPA*
82 F.4th 959 (10th Cir. 2023) ........ 13, 14, 15, 17
*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*
467 U.S. 837 (1984) ........ 37
*Citizens to Preserve Overton Park, Inc. v. Volpe*
401 U.S. 402 (1971) ........ 27
*City of Chicago v. Env't Def. Fund*
511 U.S. 328 (1994) ........ 33

*Comm. for a Better Arvin v. EPA*
786 F.3d 1169 (9th Cir. 2015) .......... 58, 59
*Committee for a Better Arvin v. EPA*
185 F.4th 957 (9th Cir. 2026) .......... 3, 33, 34, 36, 39
*Dep't of Homeland Sec. v. MacLean*
574 U.S. 383 (2015) .......... 33, 36
*Dep't of Treasury, IRS v. FLRA*
494 U.S. 922 (1990) .......... 39
*Eagle Cnty. v. Surface Transp. Bd*.
82 F.4th 1152 (D.C. Cir. 2023) .......... 60
*Hall v. EPA*
273 F.3d 1146 (9th Cir. 2001) .......... 54
*Hunt v. Washington State Apple Advertising Comm'n*
432 U.S. 333 (1977) .......... 5
*In re Core Commc'ns, Inc.*
531 F.3d 849 (D.C. Cir. 2008) .......... 61
*Kelley v. City of Albuquerque*
542 F.3d 802 (2008) .......... 52
*Ky. Res. Council, Inc. v. EPA*
467 F.3d 986 (6th Cir. 2006) .......... 49
*Loper Bright Enters. v. Raimondo*
603 U.S. 369 (2024) .......... 28, 36, 37
*Lujan v. Defenders of Wildlife*
504 U.S. 555 (1992) .......... 5
*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co*.
463 U.S. 29 (1983) .......... 28, 43, 54
*Nebraska v. EPA*
331 F.3d 995 (D.C. Cir. 2003) .......... 10
*NRDC v. EPA*
489 F.3d 1250 (D.C. Cir. 2007) .......... 60
*Oklahoma v. EPA*
723 F.3d 1201 (10th Cir. 2013) .......... 27
*Olenhouse v. Commodity Credit Corp.*
42 F.3d 1560 (10th Cir. 1994) .......... 28
*Rodway v. U.S. Dep't of Agriculture*
514 F.2d 809 (D.C. Cir. 1975) .......... 61
*Sierra Club de P.R. v. EPA*
815 F.3d 22 (D.C. Cir. 2016) .......... 13

*Sierra Club v. EPA*
21 F.4th 815 (D.C. Cir. 2021) ........ 21, 23
*Sierra Club v. EPA*
356 F.3d 296 (D.C. Cir. 2004) ........ 46
*Sierra Club v. EPA*
99 F.3d 1551 (10th Cir. 1996) ........ 11, 27
*Skaff v. Meridien N. Am. Beverly Hills, LLC*
506 F.3d 832 (9th Cir. 2007) ........ 58
*U.S. Magnesium, LLC v. EPA*
690 F.3d 1157 (10th Cir. 2012) ........ 12
*Union Elec. Co. v. EPA*
427 U.S. 246 (1976) ........ 12, 33, 38
*Utah Physicians for a Healthy Env't v. Diesel Power Gear, LLC*
21 F.4th 1229 (10th Cir. 2021) ........ 7, 15
*WildEarth Guardians v. EPA*
759 F.3d 1064 (9th Cir. 2014) ........ 49

**STATUTES**

42 U.S.C. § 7401 ........ 12
42 U.S.C. § 7407 ........ 14, 55
42 U.S.C. § 7408 ........ 13, 35
42 U.S.C. § 7409 ........ 13
42 U.S.C. § 7410 ........ 14, 15, 23, 39, 52
42 U.S.C. § 7410(*l*) ........ 17, 18, 48, 52, 53
42 U.S.C. § 7412 ........ 11, 34
42 U.S.C. § 7413 ........ 15
42 U.S.C. § 7502 ........ 33, 52
42 U.S.C. § 7502(a)(2) ........ 16
42 U.S.C. § 7502(a)(2)(A) ........ 16
42 U.S.C. § 7502(c)(6) ........ 15
42 U.S.C. § 7502(c)(9) ........ 18, 19, 31, 58
42 U.S.C. § 7509 ........ 40
42 U.S.C. § 7511 ........ 16
42 U.S.C. § 7511a ........ 16, 17
42 U.S.C. § 7511a(c)(9) ........ 18, 20, 31, 58
42 U.S.C. § 7511b ........ 34, 42
42 U.S.C. § 7513 ........ 42
42 U.S.C. § 7513(e) ........ 34
42 U.S.C. § 7513a ........ 42

42 U.S.C. § 7513b ........ 42
42 U.S.C. § 7521 ........ 35
42 U.S.C. § 7546 ........ 35
42 U.S.C. § 7585 ........ 35
42 U.S.C. § 7604(a) ........ 15
42 U.S.C. § 7607(b)(1) ........ 3
42 U.S.C. § 7625-1 ........ 35
5 U.S.C. § 706 ........ 27, 40

**OTHER AUTHORITIES**

73 Fed. Reg. 16,436 (Mar. 27, 2008) ........ 13
75 Fed. Reg. 6,474 (Feb. 9, 2010) ........ 11, 13
76 Fed. Reg. 69,896 (Nov. 9, 2011) ........ 59
80 Fed. Reg. 65,292 (Oct. 26, 2015) ........ 10
81 Fed. Reg. 26,697 (May 4, 2016) ........ 22
81 Fed. Reg. 6,616 (Feb. 8, 2016) ........ 18, 48
84 Fed. Reg. 70,897 (Dec. 26, 2019) ........ 22
87 Fed. Reg. 60,897 (Oct. 7, 2022) ........ 22
87 Fed. Reg. 60,926 (Oct. 7, 2022) ........ 22, 45
87 Fed. Reg. 67,617 (Nov. 9, 2022) ........ 12
88 Fed. Reg. 54,975 (Aug. 14, 2023) ........ 23
88 Fed. Reg. 76,676 (Nov. 7, 2023) ........ 22
89 Fed. Reg. 16,202 (Mar. 6, 2024) ........ 53
89 Fed. Reg. 59,832 (July 24, 2024) ........ 21
89 Fed. Reg. 80,749 (Oct. 4, 2024) ........ 36
89 Fed. Reg. 85,119 (Oct. 24, 2024) ........ 36
90 Fed. Reg. 19,447 (May 8, 2025) ........ 17, 20, 22, 23, 24, 25, 26, 32, 59
90 Fed. Reg. 51,029 (Nov. 14, 2025) ........ 42
91 Fed. Reg. 17,857 (Apr. 9, 2026) ........ 3, 23, 25, 26

**RULES**

10th Cir. R. 17.1 ........ 4
10th Cir. R. 28.1(A)(2) ........ 4
Fed. R. Evid. 201(b) ........ 9

**REGULATIONS**

40 C.F.R. § 50.10 ........ 13
40 C.F.R. § 50.11 ........ 13
40 C.F.R. § 50.15 ........ 13

40 C.F.R. § 81.306 ........ 9, 22
40 C.F.R. pt. 50, Apps. L, N ........ 14
40 C.F.R. pt. 51, App. V, 2.2(d) ........ 18, 53, 55, 57
Reg. 25, Part A, § II.A.7 ........ 47
Reg. 25, Part B, § I.P.4.b ........ 24, 47

## STATEMENT OF RELATED CASES

On August 5, 2026, the Ninth Circuit Court of Appeals held that Respondents United States Environmental Protection Agency and its Administrator ("EPA") "exceeded [their] authority" under the Clean Air Act ("Act") by adopting the interpretation of the Act on which the first issue in this case hinges. *Committee for a Better Arvin v. EPA*, 185 F.4th 957, 960 (9th Cir. 2026) (Bress, J., dissenting).

The Ninth Circuit remanded EPA's approval of California air pollution rules required under Section 172(c)(9) the Act, 42 U.S.C. § 7502(c)(9), called "contingency measures"—the same pollution control requirement at issue here. *Id*. ("We conclude that the EPA exceeded its authority when it grafted a feasibility exemption onto Section 172(c)(9) of the Clean Air Act, and we remand").

Like the present matter, EPA approved California contingency measures that result in "emissions reductions [that] fall short of" the emissions reductions standard for contingency measures, based on the "infeasibility" of additional pollution-reducing measures. *Id.* at 962. Ruling for the environmental advocacy group petitioners, the Ninth Circuit concluded: "The EPA erred by plucking a feasibility exemption out of thin air and reading it into Section 172(c)(9) when the language of the provision does not provide

for one. So the challenged rule is contrary to the Act's best meaning and must be remanded to the EPA." *Id*. at 964; *see also id.* at 966 ("find[ing] that Congress did not implicitly grant the EPA discretion to consider feasibility with the language of Section 172(c)(9)").

The deadline for EPA to petition for rehearing or rehearing en banc of this Ninth Circuit decision is October 5, 2026, which postdates this opening brief. The issues raised in this appeal pertaining to Section 110(*l*) of the Act were not before the Ninth Circuit.

Also pending before the Ninth Circuit are two other appeals of EPA's actions on separate California contingency measures and the agency's interpretation regarding "infeasibility" for Section 172(c)(9). First, in *Central California Environmental Justice Network, et al. v. EPA*, Case No. 26-3281 (9th Cir.), petitioners filed their petition for review on May 20, 2026. Case No. 26-4880, Dkt. No. 1. The Ninth Circuit stayed proceedings until October 5, 2026, *id*., Dkt. No. 15, which postdates this opening brief.

Second, in *Central California Environmental Justice Network, et al. v. EPA*, Case No. 26-4880 (9th Cir.), petitioners filed their petition for review on July 30, 2026. Case No. 26-4880, Dkt. No. 2. A mediation conference has been scheduled, and the Ninth Circuit has provided a first extension of petitioners' opening brief to November 17, 2026. *Id*., Dkt. No. 15.

## GLOSSARY OF ACRONYMS AND ABBREVIATIONS

Pursuant to 10th Cir. R. 28.2(C)(4), the following is a glossary of the acronyms used in this brief:

| | |
|---|---|
| APA | Administrative Procedure Act |
| AR | Administrative Record |
| EPA | United States Environmental Protection Agency |
| NAAQS | National Ambient Air Quality Standards |
| NOx | Nitrogen Oxides |
| RTC | EPA's Response to Comments |
| SIP | State Implementation Plan |
| TSD | Colorado's Technical Support Document |
| VOCs | Volatile Organic Compounds |

## INTRODUCTION

For nearly twenty years, Colorado's "Denver Metro / North Front Range" area ("Denver area") has suffered from unhealthy levels of dangerous ozone air pollution, also known as "smog." Spanning nine counties, this area is home to over 3.3 million Coloradans.

The Denver area has violated an air quality standard meant to protect public health from ozone since EPA promulgated the standard in 2008. EPA and Respondent-Intervenor State of Colorado ("Colorado") have repeatedly failed to bring ozone levels below the health-based standard by the deadlines set by the Clean Air Act. As a result, the Denver Area now has a "severe" ozone problem under the Act. It is on the verge of an "extreme" ozone problem, because of the persistence and magnitude of unhealthy ozone levels.

EPA and Colorado's repeated failure to achieve the ozone standard has triggered a specific pollution reduction requirement under the Clean Air Act called "contingency measures." Among the Act's other comprehensive requirements for cleaning up pollution that violates federal standards, Congress ordered states to develop contingency measures that serve as a backup plan for when their primary strategies fail to achieve the standards by the statutory deadline.

Contingency measures are meant to take effect immediately after the state fails to achieve the standard by the deadline. This should provide the populace with interim relief from unhealthy pollution levels, as well as progress the area towards attaining the standard while the state develops a new plan for bringing pollution levels below the standard.

For over thirty years, EPA has interpreted Sections 172(c)(9) and 182(c)(9) of the Act to require contingency measures that achieve meaningful emissions reductions. However, in its approval of Colorado's single ozone contingency measure for the Denver area, EPA abandoned its long-standing interpretation—ignoring the Act's statutory language and structure—to require only trifling emissions reductions.

Colorado's contingency measure, which is already four years late, reduces ozone pollution by only a fraction of what it is supposed to achieve. It produces just two percent of the required emissions reductions, according to EPA and Colorado's own calculations. In reality, the contingency measure is even less effective. A defect in its design actually increases ozone-causing pollution, an important consideration EPA and Colorado failed to analyze.

Despite the availability of another pollution control requirement that could also serve as a contingency measure, and despite the need for real, immediate solutions for the Denver area, EPA seeks to radically undermine

the Clean Air Act's contingency measures requirement using a new, erroneous, and arbitrary interpretation of the Act.

The Ninth Circuit already rejected EPA's new interpretation in *Committee for a Better Arvin*, 185 F.4th 957. Petitioners Center for Biological Diversity and Sierra Club (together, "Public Interest Groups") respectfully request this Court do the same.

EPA's approval violates the Clean Air Act, is arbitrary and capricious, and deprives residents of the Denver area of the statutory health protections Congress required. The Public Interest Groups seek remand of EPA's approval.

## JURISDICTIONAL STATEMENT

This Court has jurisdiction under 42 U.S.C. § 7607(b)(1) to review EPA's final action entitled "Air Plan Approval; Colorado; Serious Attainment Plan Contingency Measures and RACT Requirements for the 2008 8-Hour Ozone National Ambient Air Quality Standards for the Denver Metro/North Front Range Nonattainment Area" ("Final Rule") 91 Fed. Reg. 17,857 (Apr. 9, 2026) (Attachment 1) (Administrative Record ("AR") 00033–39).[1] Venue is

[1] Citation is to the bates numbers of the administrative record assembled by EPA—e.g., "(AR00001)." 10th Cir. R. 28.1(A). EPA has filed a certified list, Dkt.

appropriate in the Tenth Circuit because this approval is specific to Colorado. 42 U.S.C. § 7607(b)(1). The Center timely filed its petition for review on June 8, 2026. Dkt. 1.

## STANDING

The Public Interest Groups have standing to challenge EPA's approval of Colorado's deficient ozone contingency measure for the Denver area because their respective members live, work, and recreate in the Denver area and suffer from its enduring ozone pollution crisis. EPA's approval denies them the robust air pollution reductions the Clean Air Act requires.

As required to demonstrate Article III associational standing, the Center for Biological Diversity ("the Center") and Sierra Club each have members with standing to sue in their own right; the Public Interest Groups seek to protect their members and their interests from air pollution, which is directly germane to their organizational purposes; and the participation of the Public Interest Groups' individual members is not needed in this case. *Hunt v.*

16, and is not required to submit the record until its response deadline, 10th Cir. R. 17.1, so the Public Interest Groups cannot cite to record volumes per 10th Cir. R. 28.1(A)(2).

*Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977); *see* Evans Decl. ¶¶ 2–12 (Att. 2).

Individuals have standing if they suffer an injury-in-fact that is both fairly traceable to EPA's action and redressable by the Court. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992); *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000).

EPA's actions injure members of the Public Interest Groups in Colorado because air pollution will not be reduced in the required amounts as a result of EPA's approval of a deficient, *de minimis* contingency measure for the Denver area.

Scott Silber, for example, is a Center member who has lived within the Denver area violating the ozone standard for over 25 years. Silber Decl. ¶¶ 1–2 (Att. 3). He enjoys outdoor activities such as jogging, biking, hiking, and climbing, yet he developed asthma that is aggravated by poor air quality. *Id*. ¶¶ 3–4. Due to chronic exposure to air pollution, including ozone, he was also recently diagnosed with early-onset chronic obstructive pulmonary disease (COPD) and central sleep apnea. *Id*. ¶¶ 5–6. These conditions put him at an increased risk of stroke or cardiac arrest later in life. *Id*. ¶ 6. His sleep apnea requires him to use a ventilator to sleep, impairing his quality of life. *Id*. ¶¶ 7–8.

Poor air quality forces Mr. Silber to restrict or avoid the outdoor activities he loves, despite their importance to him and his health. *Id.* ¶¶ 13, 15, 17. Because air quality often deteriorates during the day, he must plan to avoid biking home in unhealthy air. *Id.* ¶ 15. Mr. Silber regularly incurs significant healthcare expenses, such as medications to treat his asthma, including EpiPens, and medical equipment, like a pulse ox monitor and respirator masks. *Id.* ¶¶ 9–11. Poor air quality from ozone, volatile organic compounds, and nitrogen oxides pollution thus injures Mr. Silber's health, finances, recreational opportunities, and aesthetic enjoyment of Colorado's great outdoors.

Jeremy Nichols, a member of the Center and Sierra Club, has lived in the Denver area for over twenty years. Nichols Decl. ¶¶ 1–2 (Att. 4). Mr. Nichols suffers injuries from air pollution, which impairs his hiking, camping, wildlife viewing, and enjoyment of the outdoors in the Denver area. *Id*. ¶ 3. Mr. Nichols avoids recreating outdoors when air quality, including ozone pollution, is especially bad, based on data from EPA-certified air quality monitors. *Id*. ¶¶ 7–8. This pollution causes him great concern over his health and that of his young son, whom he enjoys bringing with him, particularly for nearly daily hiking and bird watching. *Id*. ¶¶ 3, 5, 7–8. Mr. Nichols is aware of

the respiratory harms of this pollution, especially for vulnerable groups like children. *Id.* ¶ 4.

These injuries are concrete, actual or imminent, and fairly traceable to EPA's conduct. EPA's erroneous and arbitrary decision below allows for excess ozone, volatile organic compounds, and nitrogen oxides pollution that harms the public, including the Public Interest Groups' members, in the Denver area. *See Utah Physicians for a Healthy Env't v. Diesel Power Gear, LLC*, 21 F.4th 1229, 1242–46 (10th Cir. 2021). An order remanding EPA's approval means that Colorado will need to revisit its decision making and adopt meaningful contingency measures that reduce air pollution in compliance with the Clean Air Act.

## STATEMENT OF THE ISSUES

1. Whether EPA's approval of Colorado's contingency measure for the Denver area violates Sections 172(c)(9) and 182(c)(9) of the Clean Air Act, where EPA adopted a new interpretation of the Act that reads a feasibility exception into these contingency measures provisions.

2. Whether EPA's approval of Colorado's contingency measure violates Sections 172(c)(9) and 182(c)(9), or is otherwise arbitrary and capricious, where EPA adopted a subjective, non-statutory exception based on undefined feasibility considerations.

3. Whether EPA's approval violates Section 110(*l*) of the Act, or is otherwise arbitrary and capricious, where EPA conceded below that the contingency measure will increase emissions of nitrogen oxides pollution, but EPA and Colorado did not assess the consequences of this increased pollution for air quality.

4. Whether EPA's approval violates Sections 172(c)(9) and 182(c)(9), where EPA approved a contingency measure that only achieves *de minimis* emissions reductions and actually increases emissions of nitrogen oxides.

## STATEMENT OF THE CASE

### I. The Denver area's enduring ozone problem

Unhealthy levels of ozone pollution have persisted in the Denver area for nearly twenty years. The Denver area suffered from the eighth worst ozone levels in the country in 2025, according to the American Lung Association's compilation of EPA ozone monitoring data.[2]

The Denver area violating the health-based ozone standard covers all of Adams, Arapahoe, Boulder, Broomfield, Denver, Douglas, and Jefferson counties, as well as large swaths of Larimer and Weld counties. 40 C.F.R. § 81.306, at tbl. "Colorado–2008 8-Hour Ozone NAAQS." Over 3.3 million people reside in the Denver area, and therefore breathe unhealthy levels of ozone.[3]

---

[2] *See* Public Interest Groups' public comments on EPA's proposed rule, at 1 (June 24, 2025) (citing American Lung Association, *Most Polluted Cities*, https://www.lung.org/research/sota/city-rankings/most-polluted-cities) (AR00313).

[3] EPA, Green Book, 8-Hour Ozone (2008) Nonattainment Areas by State / County / Area (Aug. 31, 2026), https://www3.epa.gov/airquality/greenbook/hncty.html.

The Court may take judicial notice of this EPA data. *See* Fed. R. Evid. 201(b) (fact "not subject to reasonable dispute that it is . . . capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."); *Allen v. United Props. & Constr., Inc.,* No. 07-cv-00214, 2008 WL 4748511 (D. Colo. Oct. 28, 2008) (judicial notice of "public records and government documents available from reliable sources on the internet."); *see*

Ground-level ozone, the principal ingredient of "smog," is a dangerous air pollutant that attacks the lungs and other parts of the body, contributing to respiratory problems, cardiovascular issues, and premature deaths. *See* 80 Fed. Reg. 65,292, 65,302–17 (Oct. 26, 2015). According to EPA, scientific evidence also suggests a causal relationship between exposure to ozone and adverse reproductive and developmental effects, including adverse birth outcomes. *Id*. at 65,338. Children, the elderly, people with respiratory conditions like asthma, and people who work or recreate outdoors are most at risk from ozone. *Id*. at 65,294.

Ozone also damages commercial crops; vegetation, including aspens; and other qualities of the environment. *Id*. at 65,371–73, 65,377–79.

Ozone, however, is not emitted directly by pollution sources. Rather, ozone forms when nitrogen oxides ("NOx") and volatile organic compounds ("VOCs")—both of which *are* emitted directly from pollution sources like motor vehicles, oil and gas well pads, and powerplants—mix in the presence of sunlight. *See* 80 Fed. Reg. at 65,300; *Sierra Club v. EPA*, 99 F.3d 1551, 1554

*also Sierra Club*, 964 F.3d at 893 n.9 (judicial notice of "document, which is published on the EPA's website"); *Nebraska v. EPA*, 331 F.3d 995, 998 n.3 (D.C. Cir. 2003) (judicial notice of information in EPA's database).

n.3 (10th Cir. 1996). Thus, NOx and VOCs cause harm both as "precursors" to ozone, and on their own.

By itself, NOx pollution is particularly harmful to the lungs. Even short-term exposure to NOx, over the course of minutes, can impact the respiratory system, aggravate asthma, and cause symptoms such as wheezing and difficulty breathing, often resulting in hospital admissions and emergency room visits. 75 Fed. Reg. 6,474, 6,480 (Feb. 9, 2010). Long-term exposure can cause respiratory illness, particularly in children. *Id*. at 6,479. People with asthma, as well as children and the elderly, are at greater risk of adverse health effects. *Id*. at 6,481–82.

VOCs include compounds that are classified as "hazardous air pollutants," including benzene, toluene, ethylbenzene, and xylenes. 42 U.S.C. § 7412(b)(1), (2). These hazardous air pollutants are the most pernicious chemicals regulated under the Clean Air Act, contributing to an array of adverse human health impacts, including cancer, cardiovascular disease, decreased lung function, and death. *Id*.

In the Denver area, ozone precursor pollution derives from an array of sources, meaning there should be an array of pollution control options available. The oil and gas industry is the largest human-caused source of ozone pollution in the Denver area. *See* 87 Fed. Reg. 67,617, 67,621 tbl. 1

(Nov. 9, 2022). "Power plants, motor vehicles, and combustion engines," among a variety of other sources, also emit ozone precursors in the area. *Bd. of Cnty. Comm'rs of Weld Cnty. v. EPA*, 72 F.4th 284, 288 (D.C. Cir. 2023).

## II. The Clean Air Act's strategy for addressing ozone pollution

Congress adopted the Clean Air Act as "a drastic remedy to what was perceived as a serious and otherwise uncheckable problem of air pollution." *Union Elec. Co. v. EPA*, 427 U.S. 246, 256 (1976). The Act establishes a comprehensive approach to protecting public health and welfare from air pollution. 42 U.S.C. §§ 7401–7671q. One of the primary goals of the Act is "to protect and enhance the quality of the Nation's air resources." 42 U.S.C. § 7401(b)(1).

### A. National Ambient Air Quality Standards

EPA and states "share responsibility for implementing the Clean Air Act" pursuant to a cooperative federalism framework. *Center for Biological Diversity v. EPA*, 149 F.4th 1142, 1147 (10th Cir. 2025) (citing *U.S. Magnesium, LLC v. EPA*, 690 F.3d 1157, 1159 (10th Cir. 2012)).

Pursuant to this framework, EPA must establish National Ambient Air Quality Standards ("NAAQS") for the most common and harmful air pollutants.

42 U.S.C. §§ 7408(a), 7409(a). The NAAQS cap the maximum concentrations of these pollutants allowed in the ambient air nationwide; that is, they "are standards that say the air can safely contain only so much of a particular pollutant." *Center for Biological Diversity v. EPA*, 82 F.4th 959, 962 (10th Cir. 2023) (quoting *Sierra Club de P.R. v. EPA*, 815 F.3d 22, 23 (D.C. Cir. 2016)).

Relevant to this case, EPA has established separate NAAQS for ozone and NOx, as harmful air pollutants that endanger public health and welfare. *See* 40 C.F.R. §§ 50.11, 50.15; *see also* 42 U.S.C. § 7408(a)(1). Specifically:

- In 2008, EPA revised the NAAQS for ozone, limiting ozone concentrations in the ambient air breathed by everyone in the nation to 75 parts per billion. 73 Fed. Reg. 16,436 (Mar. 27, 2008); *see also* 40 C.F.R. § 50.15 ("2008 Ozone NAAQS").
- In 2010, EPA revised the primary NAAQS for NOx, establishing a new concentration limit of 100 parts per billion. 75 Fed. Reg. 6,474; *see also* 40 C.F.R. § 50.11(b) ("2010 1-hour Nitrogen NAAQS"). Thus, NOx is regulated as a precursor to ozone and as an independent pollutant of concern. EPA refers to this NAAQS as a "1-hour" NAAQS because harms can result when people are exposed to NOx for just a few minutes. 75 Fed. Reg. at 6,491–92.

After EPA establishes or revises NAAQS, like those for ozone and NOx, it must identify which areas of the country are in compliance with the standard and which are not. *Center for Biological Diversity*, 82 F.4th at 962 (citing *Ass'n of Irritated Residents v. EPA*, 790 F.3d 934, 937 (9th Cir. 2015)); 42 U.S.C. § 7407(d)(1). Areas not in compliance with the NAAQS are designated "nonattainment" areas. 42 U.S.C. § 7407(d)(1)(A)(i). "Attainment areas" meet the NAAQS. *Id*. § 7407(d)(1)(A)(ii).

To assess air quality and NAAQS violations, EPA, states, and the public rely on a nationwide "network of air monitors that collect air quality data for any given area." *Catawba County v. EPA*, 571 F.3d 20, 30 (D.C. Cir. 2009) (citing 40 C.F.R. pt. 50, Apps. L, N). "The presence of a single violating monitor justifies a nonattainment designation. In the Denver metropolitan area, EPA found five of them" in a related ozone NAAQS process. *Weld County*, 72 F.4th at 290.

**B. State Implementation Plans**

Pursuant to the Act's cooperative federalism framework, states formulate pollution control strategies in a State Implementation Plan ("SIP") that brings their nonattainment areas into compliance with the NAAQS and maintains air quality in attainment areas. 42 U.S.C. §§ 7410(a)(1), 7407(a). A

SIP must contain "enforceable emission limitations" on pollution and any "other control measures, means, or techniques" necessary to ensure that the NAAQS are achieved throughout the state. 42 U.S.C. §§ 7410(a)(1)–(2), 7502(c)(6).

States "must adopt and submit for the EPA's approval" any SIP revision. *Center for Biological Diversity*, 82 F.4th at 962 (citing 42 U.S.C. § 7410(a)(1), (a)(2)(H)). EPA must then determine whether SIP submittals are complete, meaning they have "the information necessary to enable the Administrator to determine" the submittal complies with the Act. 42 U.S.C. § 7410(k)(1)(A). Congress directed EPA to review complete SIP submittals and barred the agency from approving a SIP revision unless it meets all of the applicable requirements of the Clean Air Act. 42 U.S.C. § 7410(k)(2)–(4); *see also* § 7410(a)(2)(A).

After EPA approves the state's submittal, the SIP has "the force and effect of federal law." *Utah Physicians*, 21 F.4th at 1237. This means, *inter alia*, both EPA and members of the public can bring enforcement actions when requirements of the SIP are violated. *See* 42 U.S.C. §§ 7604(a), 7413.

### C. Nonattainment area requirements

For nonattainment areas like the Denver area, the Clean Air Act requires that the state achieve compliance with the NAAQS "as expeditiously as practicable." 42 U.S.C. §§ 7502(a)(2)(A), 7511(a)(1). As a backstop, the Act also sets a specific "attainment date" by which the state must bring the area into compliance with the NAAQS. *Id.* §§ 7502(a)(2); 7511(a)(1), (b)(1).

If a state fails to bring air quality in the nonattainment area into compliance with the NAAQS by the attainment date, EPA must downgrade the area to a worse nonattainment classification. *See id*. § 7511(b)(2)(A). Ozone nonattainment areas that fail to attain the NAAQS on time get progressively downgraded through "marginal," "moderate," "serious," "severe," and "extreme" classifications. *Id*. § 7511(a)(1), (b)(1).

Downgrading of the area results in a new statutory deadline for the state to attain the NAAQS, but the Act's directive to attain "as expeditiously as practicable" remains. *Id*. § 7511(a)(1), (b)(2)(A).

The Clean Air Act also adds additional pollution control requirements—on top of existing requirements—on nonattainment areas each time the area is downgraded to a worse classification. *See id.* §§ 7509(d), 7511a. In other words, "[a] worse nonattainment designation triggers more stringent

regulation." *Weld County*, 72 F.4th at 287 (citing 42 U.S.C. § 7511a(b)(1)(A)(i), (c)–(e)).

### D. Section 110(*l*) of the Act

In addition to the mandate that EPA can only approve SIP revisions that fully comply with the Clean Air Act, the Act bars EPA from approving a SIP revision meant to address a problem with one NAAQS at the expense of interfering with another.

Section 110(*l*) of the Act, 42 U.S.C. § 7410(*l*), acts as an "anti-backsliding provision" to protect air quality. *Center for Biological Diversity v. EPA*, 129 F.4th 1266, 1274 (10th Cir. 2025). Section 110(*l*) "prohibits the EPA from approving any revision to a SIP that 'would interfere with any applicable requirement concerning attainment . . . or any other applicable requirement of this [Act].'" *Center for Biological Diversity*, 82 F.4th at 962–63 (quoting 42 U.S.C. § 7410(*l*)); *see also* 90 Fed. Reg. 19,447, 19,459 (May 8, 2025) ("Proposed Rule") (AR00013) (recognizing the same). "'Attainment' in § 7410(*l*) refers to attainment of any NAAQS, not just the one for which a SIP or SIP revision has been submitted." *Center for Biological Diversity v. EPA*, 75 F.4th 174, 177 (3d Cir. 2023). "[O]ther applicable requirement[s]" include Clean Air Act "increments," which are the maximum allowable increases in

pollution concentrations above an established baseline level, and visibility protections. *See* 40 C.F.R. pt. 51, App. V, 2.2(d).

Section 110(*l*) is uniquely relevant to the ozone NAAQS because ozone's precursors—VOCs and NOx—can have an inverse relationship. One of the primary means by which VOCs are reduced is through combustion in a control device, like a flare or thermal oxidizer. However, combusting VOCs typically produces NOx as a byproduct. EPA, AP-42, Ch. 13.5: Industrial Flares, at 1-1 (Aug. 2019) (AR00333); 81 Fed. Reg. 6,616, 6,627 (Feb. 8, 2016); *see also* EPA, Response to Comments, at 11 ("Response to Comments" or "RTC") (AR00027). Thus, VOC emissions go down, but NOx emissions go up. But EPA cannot allow a state to rob Peter to pay Paul by pursuing one air quality goal at the expense of another.

## III. The Clean Air Act's "contingency measures" requirement

One of the requirements that applies to nonattainment areas is the adoption of pollution reduction measures called "contingency measures." 42 U.S.C. §§ 7502(c)(9), 7511a(c)(9). While the Clean Air Act sets forth detailed requirements for SIPs for nonattainment areas that are meant to bring air quality in line with the NAAQS by the statutory attainment deadlines, "Congress recognized that a State's implementation plan might not succeed."

*Ass 'n of lrritated Residents v. EPA,* 10 F.4th 937, 942 (9th Cir. 2021). That is where the Act's contingency measures requirement comes into play. 42 U.S.C. §§ 7502(c)(9), 7511a(c)(9).

"[T]he house report accompanying the 1990 amendments to the Act states that '[contingency] measures are to take effect without further action by the State o[r] Administrator, and are to be adequate to compensate for any emission reduction shortfall.'" *Committee for a Better Arvin*, 185 F.4th at 961 (quoting H.R. Rep. No. 101-490, *reprinted in Cong. Rsch. Serv., A Legislative History of the Clean Air Act Amendments of 1990*, at 3248 (1993)). Thus, these measures function as a "backup" in case the existing measures fall short. *Irritated Residents*, 10 F.4th at 947.

Accordingly, SIPs must provide for additional pollution reduction measures that are triggered immediately if the primary strategy of the nonattainment SIP fails to achieve attainment by the statutory deadline. Per Section 172(c)(9), contingency measures activate when a nonattainment area fails to attain the NAAQS by the attainment date—the relevant trigger in this case. *Id*. § 7502(c)(9).

Section 172(c)(9) also requires contingency measures that are triggered by failures to make the incremental emissions reductions necessary to achieve "reasonable further progress" under the Act, which is not the trigger at issue

here. *Id*. Similarly, Section 182(c)(9) requires contingency measures triggered by failures to make incremental reductions required to meet "milestones," also not at issue. *Id*. § 7511a(c)(9).

The Proposed Rule identified that Colorado's contingency measures must achieve emissions reductions equivalent to "'one year's worth' of progress" for the Denver area. Proposed Rule at 19,452 (AR00006).[4] This involves applying a calculation methodology prescribed by EPA to determine the "average annual reductions" that are "needed to ensure ongoing progress." *Id*. at 19,450 (AR00004).

Finally, multiple courts have faulted EPA for unlawful approvals of contingency measures in violation of Section 172(c)(9) of the Act. In 2016, the Ninth Circuit ruled in *Bahr v. EPA* that EPA violated the Act when it approved "[c]ontrol measures that have already been implemented" as contingency measures. 836 F.3d 1218, 1235–37 (9th Cir. 2016). Declining to defer to EPA's statutory interpretation, the Court ruled that Section 172(c)(9)

[4] As the Ninth Circuit recently noted, "the proposed rule required only 'one year's worth of progress.' This marked a departure from the EPA's traditional requirement that contingency measures provide for 'one year's worth of *reasonable further* progress," *Committee for a Better Arvin*, 185 F.4th at 962 (emphasis added), with the latter standard typically requiring more emissions reductions. Colorado did not get anywhere near meeting either emissions reduction standard, and the distinction is not directly at issue here.

plainly requires "control measures that will be implemented in the future" after being "triggered by the state's failure 'to make reasonable further progress' or to attain the NAAQS." *Id*. at 1235; *see also Sierra Club v. EPA*, 21 F.4th 815, 827–28 (D.C. Cir. 2021) (adopting *Bahr*'s rationale).

In *Association of Irritated Residents*, the Ninth Circuit called out EPA's approval of ozone contingency measures as "a transparent effort to circumvent *Bahr*." 10 F.4th at 946. The Court rejected EPA's attempt to rely on "emissions reductions from existing measures to make up for what everyone agrees otherwise would be an inadequate contingency measure." *Id*.

## IV. EPA and Colorado's repeated failure to attain the ozone NAAQS

EPA and Colorado have a long, unfortunate history of failing to control ozone in the Denver area. This continued noncompliance is largely due to EPA and Colorado's repeated failure to create effective SIPs that reduce ozone pollution to levels that meet the health- and welfare-based NAAQS.

Since EPA promulgated the 2008 ozone NAAQS, EPA and Colorado have failed six times to create a SIP that fixes the ozone problem in the Denver area. This has resulted in the area repeatedly failing to attain by the attainment date and being downgraded through the marginal, moderate, and serious nonattainment classifications. *See* 89 Fed. Reg. 59,832 (July 24, 2024); 87 Fed.

Reg. 60,897 (Oct. 7, 2022); 87 Fed. Reg. 60,926 (Oct. 7, 2022); 84 Fed. Reg. 70,897 (Dec. 26, 2019); 81 Fed. Reg. 26,697 (May 4, 2016). As a result, it is now a "severe" ozone nonattainment area for the 2008 ozone NAAQS. 40 C.F.R. § 81.306, tbl. "Colorado–2008 8-Hour Ozone NAAQS."

Specifically, this "severe" classification is the consequence of EPA and Colorado failing to bring the Denver area into compliance with the 2008 ozone NAAQS by the July 20, 2021 attainment date that applied when the Denver area was still in "serious" nonattainment. 87 Fed. Reg. at 60,927–28. This failure to attain was the triggering event for the contingency measures requirement at issue. Proposed Rule at 19,449 (AR00003). Thus, EPA and Colorado were supposed to have contingency measures in place that started reducing ozone four years ago.

The Denver area is on the verge of "extreme" nonattainment, with ozone levels that are not budging and a looming attainment date of July 20, 2027. 87 Fed. Reg. at 60,929.

## V. Ozone contingency measures for the Denver area

Colorado initially submitted to EPA contingency measures meant to satisfy this requirement of Sections 172(c)(9) and 182(c)(9) on March 22, 2021. 88 Fed. Reg. 76,676, 76,677 (Nov. 7, 2023).

EPA disapproved Colorado's initial contingency measures for the Denver area in November 2023. *Id*. EPA premised its disapproval on the D.C. Circuit decision in *Sierra Club*, 21 F.4th at 827–28, which, in turn, endorsed the Ninth Circuit's decision in *Bahr*, 836 F.3d at 1235–37. 88 Fed. Reg. 54,975, 54,977–98 (Aug. 14, 2023). Colorado's initial contingency measures impermissibly relied on pollution reductions that were already implemented, and thus were not "conditional and prospective," in contravention of Sections 172(c)(9) and 182(c)(9) of the Act. *Id*.

This disapproval started a two-year clock for Colorado to submit new contingency measures or for EPA to promulgate a "Federal Implementation Plan" that would fill the gap. 42 U.S.C. § 7410(c)(1).

In three SIP submittals from June 2023, May 2024, and April 2025, Colorado provided the contingency measures plan to EPA that underlies this case. Proposed Rule at 19,450 (AR00004). EPA approved this plan in the Final Rule.

The sole contingency measure that EPA approved[5] is meant to limit VOC emissions from motor vehicle coatings ("Motor Vehicle Coatings Measure").

[5] Colorado also submitted a second contingency measure related to oil and gas equipment. EPA determined that this measure "would not be viable as contingency measures" because its requirements were already in effect, in

*See* Colorado, Technical Support Document ("TSD") at 511 (AR07809); *see also* 5 C.C.R. 1001-29 ("Reg. 25"), Part B, § I.P.4.b (Colorado's codification of the requirement in its regulations) (AR00517). In relevant part, the Motor Vehicle Coatings Measure limits the VOC content of materials used by "automotive coating operations" to reduce VOC emissions resulting from use, transport, and storage of the materials. TSD at 511 (AR07809). Instead of using low-VOC-content materials, the Measure also allows regulated entities to use an emissions control system to destroy VOCs before they are emitted. Reg. 25, Part B, § I.P.4.b (AR00517).

Colorado determined, and EPA accepted, that it was required to reduce VOCs by 14.2 tons per day and NOx pollution by 8.9 tons per day to meet the reductions required by "one year's worth of progress." Proposed Rule at 19,452 (AR00006). Yet, according to Colorado's assessment, which EPA adopted below, the Motor Vehicle Coatings Measure reduces VOC emissions by 0.54 tons per day and produces zero reductions of NOx emissions. *Id*. at 19,454 (AR00008). Accordingly, in Colorado's own estimation, its contingency measure only achieves 3.8 percent of the required reductions of VOCs. TSD at 510 (AR07808). The Motor Vehicle Coatings Measure only

---

contravention of *Sierra Club*, 21 F.4th at 827–28. AR10035–36. It is not a contingency measure. Final Rule at 17,857 (AR00033).

achieves two percent of the required reductions for total ozone precursors (VOCs and NOx together). Proposed Rule at 19,452, 19,454 (AR00006, 8).

Colorado's assessment and EPA's Proposed Rule also do not contain any mention of the increase in NOx pollution that results from using emission control systems to destroy VOCs through combustion pursuant to the Motor Vehicle Coatings Measure. *See generally, e.g.*, TSD at 490–584, (AR07788–7882); Proposed Rule (AR00001–13). Instead, these materials represent that nitrogen oxide emissions reductions will be zero tons per day. EPA only acknowledged the increase in NOx pollution in response to the Public Interest Groups' comments on the Proposed Rule. RTC at 10–14 (AR00026–30).

Even though Colorado did not adopt a contingency measure that achieved the required emissions reductions, EPA determined that Colorado satisfied the contingency measure requirements of Sections 172(c)(9) and 182(c)(9) of the Clean Air Act based on the Motor Vehicle Coatings Measure and an "infeasibility justification" to "demonstrate why it is not possible to adopt additional measures." Final Rule at 17,858 (AR00034); RTC at 4 (AR00020).

## VI. Rulemaking history

EPA published notice of the Proposed Rule in the *Federal Register* on May 8, 2025. 90 Fed. Reg. 19,447 (AR00001–13). EPA proposed to approve Colorado's Motor Vehicle Coatings Measure and "infeasibility justification" as meeting the contingency measure requirements of Sections 172(c)(9) and 182(c)(9) that applied to the Denver area because of its failure to attain the 2008 ozone NAAQS in 2021. *Id*. at 19,455 (AR00009).

On June 24, 2025, the Public Interest Groups submitted comments objecting to EPA's proposal. AR00313–21. The Public Interest Groups detailed the same issues before this Court. *See* AR00315–21.

Despite the Public Interest Groups' comments, EPA determined that Colorado had satisfied the contingency measures requirement for the Denver area in the April 9, 2026 Final Rule. 91 Fed. Reg. 17,857 (AR00033–39). EPA's Final Rule and the accompanying Response to Comments adopts the analysis, findings, and conclusions presented in the agency's proposed rule. EPA, however, addressed the increases in NOx emissions from the Motor Vehicle Coatings Measure for the first time in its Response to Comments. RTC at 10–14 (AR00026–30).

The Center timely filed its petition for review to initiate this appeal on June 8, 2026. Dkt. No. 1. On July 2, 2026, Colorado filed its notice of intervention in the case. Dkt. 11.

## STANDARD OF REVIEW

The Clean Air Act does not set forth an applicable standard of judicial review for challenges to EPA approvals of SIP revisions. *See* 42 U.S.C. § 7607(b). Accordingly, this Court applies the general standard of review for agency action set forth in section 706 of the federal Administrative Procedure Act ("APA"). *Alaska Dep't of Envtl. Conservation v. EPA*, 540 U.S. 461, 496–97 (2004); *Oklahoma v. EPA*, 723 F.3d 1201, 1211 (10th Cir. 2013).

Section 706 of the APA provides, in relevant part: "The reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see Sierra Club v. EPA*, 99 F.3d 1551, 1555 (10th Cir. 1996). Additionally, if the action fails to meet statutory requirements, the Court must hold the agency action unlawful. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 413–14 (1971) (citing 5 U.S.C. § 706(2)(C)).

This Court reviews EPA's construction of the Clean Air Act *de novo*, exercising its "independent judgment in deciding whether [the] agency has acted within its statutory authority, as the APA requires." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024). Section 706 "makes clear that agency interpretations of statutes . . . are *not* entitled to deference." *Id*. at 392 (emphasis in original). *Loper Bright* instructs the Court to "deploy[] its full interpretative toolkit" to determine the statute's "single, best meaning." *Id*. at 400, 454; *accord id*. at 400 ("In the business of statutory interpretation, if it is not the best, it is not permissible.").

In addition, an agency action is arbitrary, capricious, or an abuse of discretion, when the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation for its decision which runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983); *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1574–75 (10th Cir. 1994).

## SUMMARY OF THE ARGUMENT

Congress adopted Sections 172(c)(9) and 182(c)(9) of the Act to provide for meaningful back-up air pollution controls when the primary strategies in a SIP fail to achieve attainment of the NAAQS. However, in the proceeding below EPA effectively exempted Colorado from adopting contingency measures, which were already four years delayed.

The sole contingency measure approved by EPA achieves a fraction—just two percent—of the required reductions in ozone precursors (VOCs and NOx), according to EPA and Colorado's own calculations. In reality, it is even less effective, because it increases emissions of NOx.

Despite these deficiencies, EPA determined that Colorado had satisfied the Clean Air Act's contingency measures requirement for the Denver area. EPA did so based on a purported "infeasibility justification," in which Colorado claimed that it could not feasibly adopt any contingency measure beyond the Motor Vehicle Coatings Measure.

This was in error and arbitrary. Sections 172(c)(9) and 182(c)(9) do not include any feasibility exception for contingency measures, while numerous other Act provisions explicitly authorize feasibility considerations. Nor does the Act afford EPA discretion to introduce feasibility considerations

where none are provided for, or otherwise allow the standardless and arbitrary approach to evaluating feasibility that EPA applied below.

In addition, EPA and Colorado originally represented that the reduction in emissions of NOx from the Motor Vehicle Coatings Measure was zero. However, as EPA conceded in its response to the Public Interest Groups' comments, the Measure will increase NOx pollution. This triggers the Clean Air Act's anti-backsliding provision, Section 110(*l*), which does not allow EPA to approve a SIP revision that furthers one air quality goal at the expense of another. EPA's assessment of the increase in NOx emissions contravened this requirement, was arbitrary, and failed to consider several important aspects of the problem.

Finally, Sections 172(c)(9) and 182(c)(9) do not condone the approval of Colorado's lone contingency measure that only delivers *de minimis* VOC emissions reductions and actually increases emissions of NOx.

# ARGUMENT

## I. EPA's approval of Colorado's contingency measure in reliance on non-statutory, standardless considerations of feasibility violates the Clean Air Act and is arbitrary.

The plain language of Sections 172(c)(9) and 182(c)(9) does not identify any exceptions for feasibility considerations. 42 U.S.C. §§ 7502(c)(9), 7511a(c)(9). A variety of other Clean Air Act provisions expressly provide for considerations of feasibility. Congress included feasibility exceptions where it wanted to. This lack of an explicit feasibility exception does not afford EPA discretion to insert one.

Section 172(c)(9) flatly declares that a SIP for a nonattainment area "shall provide for the implementation of specific measures to be undertaken if the area fails to make reasonable further progress, or to attain the national primary ambient air quality standard by the attainment date applicable under this part." *Id*. § 7502(c)(9).

Section 182(c)(9) sets forth the same operative language, but with respect to areas that fail to meet milestones: "In addition to the contingency provisions required under section 7502(c)(9) of this title, the plan revision shall provide for the implementation of specific measures to be undertaken if the area fails to meet any applicable milestone." *Id*. § 7511a(c)(9).

EPA admits, as it must, that "section 172(c)(9) and section 182(c)(9) do not explicitly provide for consideration of whether specific measures are feasible." EPA, *Guidance on the Preparation of SIP Provisions that Address the Nonattainment Area Contingency Measure Requirements*, at 33 ("2024 Guidance") (AR00292).

Nonetheless, in approving Colorado's Motor Vehicle Coatings Measure, EPA maintained that it could exempt a state from the requirement to adopt robust contingency measures as long as a state "explain[s] and document[s] the state's evaluation of existing and potential control measures . . . and the state's conclusions regarding whether such measures are feasible as contingency measures." Proposed Rule at 19,450 (AR00004). Even if EPA could consider feasibility for contingency measures, which it cannot, EPA's standardless test for feasibility is arbitrary.

### A. EPA exceeded its authority under the Clean Air Act by premising its approval on considerations of feasibility.

Numerous other provisions in the Clean Air Act *do* explicitly provide for infeasibility exceptions, unlike Sections 172(c)(9) and 182(c)(9). "Congress generally acts intentionally when it uses particular language in one section of a statute but omits it in another." *Dep't of Homeland Sec. v. MacLean*, 574 U.S.

383, 391 (2015); *see also City of Chicago v. Env't Def. Fund*, 511 U.S. 328, 338 (1994) ("Congress knew how to draft a[n] . . . exemption . . . when it wanted to."). As the Supreme Court noted in one of the first Clean Air Act cases it ever heard, "[w]here Congress intended the [EPA] Administrator to be concerned about economic and technological feasibility, it expressly so provided." *Union Elec.*, 427 U.S. at 257 n.5. Accordingly, the Court should not interpret Sections 172(c)(9) and 182(c)(9) to allow EPA to grant an exemption that does not appear in the text.

The canon of statutory interpretation that Congress acts deliberately when it omits language that is included elsewhere in a statute "applies with particular force" here. *MacLean*, 574 U.S. at 392. That is because "[f]easibility is expressly referenced numerous times throughout the Act and the term appears 'in close proximity' to Section 172(c)(9)." *Committee for a Better Arvin*, 185 F.4th at 964 (quoting *MacLean*, 574 U.S. at 392). Within Section 172 itself, Congress permitted the Administrator to consider "the availability and feasibility of the pollution control measures" when deciding the appropriate classification for nonattainment areas, 42 U.S.C. § 7502(a)(1)(A), and whether to extend an area's attainment date, 42 U.S.C. § 7502(a)(2)(A).

The same is true of Section 182. This section allows the EPA Administrator to approve an ozone SIP strategy that does not achieve the

emissions reductions that are typically required for "reasonable further progress" if the SIP "includes all measures that can feasibly be implemented in the area, in light of technological achievability." 42 U.S.C. § 7511a(b)(1)(A)(ii)(III), (c)(2)(B)(ii); *see also* § 7511b(e)(1)(A) (defining "best available controls" required for certain pollution sources in ozone nonattainment area as "the degree of emissions reduction that the Administrator determines, on the basis of technological and economic feasibility . . . is achievable"). Sections 172(c)(9) and 182(c)(9) do not include this language, by design.

The Ninth Circuit relied on several other examples of provisions with express feasibility considerations when rejecting the same interpretation of Section 172(c)(9) EPA offered below, stating "Congress *has* provided for feasibility considerations elsewhere in the Act." *Committee for a Better Arvin*, 185 F.4th at 963–64, citing:

- 42 U.S.C. § 7412(h)(1) ("if it is not feasible in the judgment of the Administrator to prescribe or enforce an emission standard" for hazardous air pollutants EPA may promulgate other "design, equipment, work practice, or operational standard[s]");
- *Id*. § 7513(e) (allowing EPA to extend attainment dates if the SIP "includes the most stringent measures that . . . *can feasibly be*

*implemented in the area*" and providing for consideration of "the technological and economic feasibility of various control measures.");

- *Id*. § 7521(a)(5)(B) (vehicle regulations do not become effective until "it *would be feasible* to implement such standards, taking into consideration the restraints of an adequate leadtime for design and production"); *see also id*. § 7521(c)(1), (j)(3), (*l*)(1), (m)(2).

Additional examples abound. *See, e.g.*, 42 U.S.C. §§ 7408(f)(1)(A)(xv), 7546(b)(2)(A), 7571(a)(1)(B), 7585(b)(1), 7625-1(a)(1). Congress could have explicitly provided that EPA should consider feasibility in Section 172(c)(9), as it did in a variety of other provisions, but it did not.

As indicated above, in *Committee for a Better Arvin* the Ninth Circuit recently rejected and remanded the same interpretation of Section 172(c)(9) EPA relied on below to excuse Colorado's failure to adopt contingency measures that achieve the required emissions reductions. The Court premised its decision on the same interpretive canon espoused here, concluding: "EPA erred by plucking a feasibility exemption out of thin air and reading it into Section 172(c)(9) when the language of the provision does not provide for one. So the challenged rule is contrary to the Act's best meaning

and must be remanded to the EPA." 185 F.4th at 964 (quoting *MacLean*, 574 U.S. at 391).

In defense of its approval of the California contingency measures at issue in *Committee for a Better Arvin*, EPA asserted that "the statutory provisions applicable to other nonattainment area plan control measure requirements . . . allow air agencies to exclude certain control measures that are deemed unreasonable or infeasible." 89 Fed. Reg. 80,749, 80,757 (Oct. 4, 2024); *see also* 89 Fed. Reg. 85,119, 85,123 (Oct. 25, 2024) (relying on the same rationale).

"In other words, the EPA's position is that explicit feasibility allowances elsewhere in the Act suggest that it can consider feasibility in this instance." *Committee for a Better Arvin*, 185 F.4th at 963. To the contrary, "the fact that other provisions in the Act provide for infeasibility exemptions—and that Section 172(c)(9) does not—fatally undermines the EPA's position." *Id*. Interpreting Sections 172(c)(9) and 182(c)(9) to include a feasibility exception defies the "single, best meaning" of these provisions of the Act. *Loper Bright*, 603 U.S. at 400.

### B. The Clean Air Act does not afford EPA discretion to consider feasibility for contingency measures.

In EPA's Response to Comments, the agency raised another argument rejected by the Ninth Circuit in *Committee for a Better Arvin*. EPA argued that "Congress granted the EPA discretionary authority to consider feasibility" for contingency measures even where Sections 172(c)(9) and 182(c)(9) do not include a feasibility consideration. RTC at 5 (AR00021). EPA's support for this argument is that "[b]y requiring only that a state adopt 'specific measures' that shall 'take effect,' and declining to impose any further qualifications under CAA sections 172(c)(9) and 182(c)(9), Congress granted" this discretionary authority. *Id*.

The Supreme Court, however, has directly rejected the presumption "that statutory ambiguities are implicit delegations to agencies." *Loper Bright*, 603 U.S. at 399. The Supreme Court reiterated that "ambiguities may result from an inability on the part of Congress to squarely answer the question at hand, or from a failure to even 'consider the question' with the requisite precision," but "[i]n neither case does an ambiguity necessarily reflect a congressional intent that an agency, as opposed to a court, resolve the resulting interpretive question." *Id*. (citing *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 865 (1984)).

Trying to squeeze blood from a stone, EPA reads "feasibility" out of Congress' use of the terms "specific measures" and "take effect" in Sections 172(c)(9) and 182(c)(9). RTC at 5–6 (AR00021–22). In *Union Electric*, the Supreme Court rejected an electric utility company's attempt to interject a feasibility exception into a Clean Air Act provision where Congress did not expressly provide for one. 427 U.S. at 257–58. The utility argued that EPA should reject a SIP revision the utility claimed it would have trouble complying with because the Act implicitly allowed EPA to consider technological and economic infeasibility, where the Act requires that NAAQS be met "as expeditiously as practicable" and within a "reasonable time." *Id*. The utility further asserted that "what is 'practicable' or 'reasonable' cannot be determined without assessing whether what is proposed is possible." *Id*. at 258.

The Supreme Court firmly rejected this argument conflating other statutory considerations with a feasibility exception. *Id.* at 257–58. Because feasibility was not among the factors EPA needed to consider when evaluating a SIP revision, the Court concluded that "Congress intended claims of economic and technological feasibility to be wholly foreign to the Administrator's consideration of a state implementation plan." *Id*. at 256.

When the Ninth Circuit rejected EPA's argument that the agency has "discretionary authority" to consider feasibility for contingency measures in *Committee for a Better Arvin*, partially relying on *Union Electric*, the Court stated: "if the phrases 'as expeditiously as practicable,' and 'within a reasonable time' do not permit consideration of feasibility, it is difficult to see how 'specific measures to be undertaken,' a phrase even further disconnected from feasibility, would allow it." 185 F.4th at 965; *see also id.* at 965–66 (finding additional support for rejecting EPA's claim to "discretionary authority" in *Dep't of Treasury, IRS v. FLRA*, 494 U.S. 922, 931–32 (1990)).

In its Response to Comments, EPA also references three Clean Air Act provisions to support its claim that "the CAA delegates authority to the EPA" to assess the feasibility of contingency measures. RTC at 5 (AR00021). These provisions do not support EPA's position.

*First*, EPA cites Section 110(k)(3), 42 U.S.C. § 7410(k)(3), "which charges the EPA with reviewing state plans to ensure they meet all applicable requirements." RTC at 5 (AR00021). This is a nonstarter. Section 110(k)(3) provides that EPA "shall approve" a SIP revision, in whole or "in part," "if it meets all of the applicable requirements" of the Act. 42 U.S.C. § 7410(k)(3). This provision does not afford EPA blanket discretion to gap fill for those

applicable requirements. 5 U.S.C. § 706(2)(C) (agency action "in excess of statutory[] authority, or limitations" is unlawful).

*Second*, EPA draws on Section 182(c)(2)(B)(ii), 42 U.S.C. § 7511a(c)(2)(B)(ii), related to "reasonable further progress" for serious ozone nonattainment areas to argue that it can consider feasibility for Section 182(c)(9) contingency measures. RTC at 6 (AR00022). EPA does not reference Section 172(c)(9) measures here. The Section 182(c)(2) provision EPA relies on does contain an express feasibility exception. 42 U.S.C. § 7511a(c)(2)(B)(ii). The Section 182(c)(9) contingency measures requirement, however, is a separate provision of this same section and does not include a feasibility exception, indicating Congress' intent to exclude one. *MacLean*, 574 U.S. at 392. Further, the Motor Vehicle Coatings Measure was triggered by the Denver area's failure to attain the NAAQS and, accordingly, is a Section 172(c)(9) contingency measure. This EPA argument only targeted Section 182(c)(9) contingency measures, triggered by a failure to meet a "milestone." RTC at 6 (AR00022). Section 172(c)(9) is not implicated by EPA's oblique reference to Section 182(c)(2)(B)(ii).

*Third*, EPA's reliance on Section 179(d)(2), 42 U.S.C. § 7509(d)(2), also undercuts its position. EPA only partially quotes this provision in its Response to Comments. RTC at 6 (AR00022) ("SIP revisions to address

nonattainment areas must include 'all measures that can be feasibly implemented in the area in light of technological achievability, costs, and any non-air quality and other air quality-related health and environmental impacts.'" (citing a portion of 42 U.S.C. § 7509(d)(2))). EPA omits the important language that begins this sentence: "the [SIP] revision shall include such additional measures as *the [EPA] Administrator* may reasonably prescribe, including all measures that can be feasibility implemented in the area . . ." 42 U.S.C. § 7509(d)(2) (emphasis added).

This subsection of the Act provides that states must adopt new SIP revisions upon a nonattainment area's failure to attain, without any reference to feasibility exceptions. 42 U.S.C. § 7509(d)(1)–(2). This includes adopting contingency measures; again, without reference to feasibility. *Id*. § 7509(d)(2) ("The [SIP] revision required . . . shall meet the requirements of . . . section 7502."). The sentence EPA partially quotes then provides that it is *the EPA Administrator* that can "reasonably prescribe" any "additional measures"—on top of the Act's default SIP requirements for states—and the Administrator considers feasibility for those additional measures. *Id*. Congress included and excluded feasibility exceptions intentionally.

### C. EPA's standardless considerations of feasibility demonstrate that the agency's interpretation contravenes the Clean Air Act.

The Clean Air Act does not define feasibility, or infeasibility, in one universal way. Instead, where the Act does provide for feasibility considerations, the relevant factors vary depending on the control measure and requirement.[6]

Indeed, in other recent proceedings where EPA has derived a feasibility exception for contingency measures, EPA has acknowledged that determining infeasibility for various SIP control measures "depend[s] on the requirement." *See, e.g.,* 90 Fed. Reg. 51,029, 51,032 (Nov. 14, 2025) (EPA proposal to approve California contingency measures for ozone, as well as the state's "infeasibility demonstration").

Because Congress provided for no feasibility exception for contingency measures, there are no standards or criteria that provide bounds to EPA's feasibility consideration. This underscores EPA's erroneous interpretation of

---

[6] *See, e.g.*, 42 U.S.C. § 7511b(e)(1)(A) (defining "best available controls" for certain ozone sources); *id*. § 7513(e) (addressing "feasibility" for purposes of determining the "most stringent measures" for serious particulate matter areas); *id*. § 7513a(b)(1)(B) (requiring "best available control measures" for serious particulate matter nonattainment areas); *id*. § 7513b (requiring EPA to issue "[Reasonably Available Control Measures] and [Best Available Control Measures] guidance" for certain sources of particulate matter).

the Act—there are no statutory limits on EPA's feasibility consideration because there is no statutory authority to consider feasibility in the first place. Further, EPA's standardless consideration of feasibility means it arbitrarily "relied on factors which Congress has not intended it to consider." *State Farm*, 463 U.S. at 43.

Adding to the errant and arbitrary nature of considering feasibility for contingency measures, EPA states in its Response to Comments that, in terms of standards, it "recommends that air agencies evaluate the economic feasibility of potential CMs based on a cost/ton threshold that is higher than what was considered in a fashion similar to the economic analysis for measures in the control strategy in the nonattainment area, including any thresholds associated with RACT determinations." RTC at 7 (AR00023) (quoting 2024 Guidance at 43 (AR00299)). EPA appears to suggest that there is a higher threshold for categorizing a potential contingency measure as infeasible, relative to feasibility considerations for other kinds of control measures, but the parameters are unbounded.

The Proposed and Final Rules do not otherwise identify any clear standards or criteria for how EPA will administer the exception to Sections 172(c)(9) and 182(c)(9) that EPA has crafted of whole cloth. Nor does the

2024 Guidance provide objective standards.[7] *See* 2024 Guidance at 33–45 (AR00292–304). Nothing in Sections 172(c)(9) or 182(c)(9) suggests EPA may grant standardless exemptions that can swallow the whole of the contingency measures requirement, or to otherwise exercise its authority in such an arbitrary manner.

Finally, the errant, arbitrary nature of EPA's approach to feasibility considerations is further underscored by EPA's incorrect determination "that there are no feasible control measures that could be adopted as contingency measures in addition to the motor vehicle coatings measures." Proposed Rule at 19,455 (AR00009). EPA and Colorado entirely failed to identify the availability of a pollution control measure that could serve as contingency measure.

As explained above, EPA and Colorado failed to bring ozone levels into compliance with the 2008 ozone NAAQS by the 2021 attainment date for the

[7] The 2024 Guidance expressly states that it "is not a rule or regulation" and "does not change or substitute for any law regulation, or other legally binding requirement." 2024 Guidance at 2 (AR00261). By its own terms it "is not legally enforceable" and "is not intended to and does not establish legally binding requirements." *Id*. Further, "[o]nly final EPA actions taken to approve or disapprove state implementation plan (SIP) submissions that implement any of the recommendations in this guidance would be final actions for purposes of CAA section 307(b)." *Id*. The 2024 Guidance has not been subject to judicial review.

"serious" classification. 87 Fed. Reg. at 60,936. Along with triggering the contingency measures requirement at issue, the failure to attain obligated Colorado to submit a new, stricter SIP for EPA approval to achieve attainment by the July 2027 attainment date for the "severe" classification. *Id*. at 60,931.

This severe SIP submittal, which EPA has not yet approved, contains a contingency measure. This measure would limit the VOC content of a variety of consumer products, like insect repellent, hair spray, and paint thinners. *See* Colorado, *State Implementation Plans for the Denver Metro and North Front Range Ozone Nonattainment Area*, at 10-4 to 10-5 (AR00949–50). Colorado estimated VOC emission reductions of 3.1 tons per day from the measure, *id*., which is low, but more than the 0.54 tons per day from the Motor Vehicle Coatings Measure.

Despite the availability of this contingency measure, EPA and Colorado did not consider it in this rulemaking or explain why not. The measure is sitting inactive as part of the severe SIP submittal. EPA was well aware of this contingency measure, because it was submitted to the agency in June 2023 as part of the same submittal package that contained the Motor Vehicle Coatings Measure, in the same section. AR00949–50.

That the measure is already part of another submittal is not an obstacle—Colorado repurposed the Motor Vehicle Coatings Measure from a separate SIP submittal.[8]

EPA and Colorado cannot "promise to do tomorrow what the Act requires today." *Sierra Club v. EPA*, 356 F.3d 296, 298 (D.C. Cir. 2004). The availability of this candidate contingency measure, and EPA and Colorado's failure to evaluate it, was arbitrary in and of itself, but this failure also exposes EPA's unmoored interpretation of the Act's contingency measures requirement.

## II. EPA's failure to analyze the NOx emissions increases resulting from Colorado's contingency measure violates Section 110(*l*) of the Act and is arbitrary.

The Motor Vehicle Coatings Measure reduces VOC emissions by a meager 0.54 tons per day, when at least 14.2 tons per day of VOC reductions are required. Proposed Rule at 19,452, 19,454 (AR00006, 8). EPA and Colorado identified that the Measure produces no reductions of NOx, when at

[8] *See* Proposed Rule at 19,448 (AR00002) (describing how Colorado previously "identifie[d] motor vehicle coatings emission control requirements as a contingency measure for the Moderate ozone [SIP]," but "[t]he State is now repurposing the requirement as a contingency requirement for the Serious ozone [SIP].")

least 8.9 tons per day of reductions are required. TSD at 510 (AR7808). Thus, the Motor Vehicle Coatings Measure provides just two percent of the total required ozone precursor reductions. *Id*.

But the Motor Vehicle Coatings Measure is even less effective than that, because EPA and Colorado failed to account for the *increase* in NOx pollution that it causes. The Motor Vehicle Coatings Measures allows regulated entities to comply with the measure by using coating products with a lowered VOC content, which results in less VOC emissions from activities like usage and storage of the product. Reg. 25, Part B, § I.P.4.b (AR00517). But regulated entities can also elect to reduce VOCs with an "emission control system" that reduces VOCs by combusting them in control devices like flares and thermal oxidizers. *Id.*;[9] *see also* Reg. 25, Part A, § II.A.7 (AR00478) (defining "control device" to include a "flare" or "other device" that "will reduce the concentration of VOC in a gas stream by . . . combustion . . .").

These control devices reduce VOCs but produce NOx pollution as a byproduct. EPA, AP-42, Ch. 13.5: Industrial Flares, at 1-1 (Aug. 2019)

[9] Specifically, the Motor Vehicle Coatings Measure requires "the owner or operator of automative coating facilities" to "[u]se products manufactured on or after [May 1, 2026] that comply with the following VOC content limits in Table 4 or reduce VOC emissions from automotive coatings with an emission control system having a control efficiency of 90% or greater." Reg. 25, Part B, § I.P.4.b (AR00517).

(AR00333); *see also* 81 Fed. Reg. at 6,627 ("Flaring of gas produces NOx and particulate matter, both of which can cause respiratory and heart problems."). This is indisputable. *See* RTC at 11 (AR00027) (acknowledging "[t]hermal and catalytic oxidizers are combustion devices and [] they do produce NOx emissions" and "[f]lares, which do produce NOx emissions . . ."). Accordingly, the Motor Vehicles Coating Measure actually increases NOx pollution, which EPA conceded in its Response to Comments. *Id*. at 11, 13 (AR00027, 29).

Colorado's SIP submittal and EPA's Proposed Rule did not account for, assess, or even mention this increase in one of the two ozone precursors Colorado's contingency measures were supposed to reduce. It was not until the Public Interest Groups identified this fundamental defect that EPA acknowledged the issue with a deficient response in its Response to Comments.

### A. EPA violated Section 110(*l*) of the Clean Air Act by failing to analyze the increases in NOx pollution resulting from Colorado's contingency measure.

Section 110(*l*) of the Clean Air Act, 42 U.S.C. § 7410(*l*), provides that EPA "shall not approve a revision of a [SIP] if the revision would interfere with any applicable requirement concerning attainment . . . or any other applicable requirement" of the Act. This is one of the "anti-backsliding" features of the

Act—*Center for Biological Diversity*, 129 F.4th at 1274—meant to ensure that a state cannot make progress towards one air quality goal at the expense of another.

EPA's "longstanding view" of Section 110(*l*) is that SIP "revisions comply . . . 'as long as actual emissions in the air are not increased.'" *Id*. (quoting *Ky. Res. Council, Inc. v. EPA*, 467 F.3d 986, 995 (6th Cir. 2006)). That is so "even if the SIP merely maintain[s] the status quo." *Id*. (quoting *WildEarth Guardians v. EPA*, 759 F.3d 1064, 1074 (9th Cir. 2014)).

However, as this Court explained, "[w]hen the EPA expects that a revision *may increase emissions* it typically requires a state to either (1) submit an air-quality analysis showing that the revision would not interfere with any applicable requirement or (2) substitute equivalent or greater emissions reductions to preserve status quo air quality." 129 F.4th at 1275 (emphasis added).

Here, "actual emissions" of NOx *are* "increased" by the Motor Vehicle Coatings Measure, as EPA conceded in its Response to Comments. RTC at 11, 13 (AR00027, 29). The Measure does not maintain the status quo for NOx pollution, it degrades it.

Yet EPA did not require Colorado to address this gap in its assessment with an air-quality analysis or to remedy it with substituted emissions

reductions. Nor did EPA itself evaluate the implications of increased NOx pollution for Clean Air Act requirements in the Denver area pursuant to Section 110(*l*).

Instead, EPA relied on a "[c]onsideration of the *wholistic impact* of [the] rule revision on attainment of the NAAQS." RTC at 14 (emphasis added) (AR00030). EPA concluded that "[w]hen considered *in totality*, the [Motor Vehicle Coatings Measure] will reduce NOx/VOC emissions and will have a net air quality benefit . . . Therefore, it is unnecessary for the EPA to conduct additional analysis to determine whether the more stringent requirements that are the subject of this rulemaking would interfere with attainment." RTC at 10 (emphasis added) (AR00026).

For the same reason—because the Motor Vehicle Coatings Measure "will reduce emissions" of ozone precursors overall—EPA excused Colorado from not "includ[ing] additional information to demonstrate that the NAAQS, prevention of significant deterioration increments, reasonable further progress, and visibility are protected if the plan is approved." *Id*. at 11 (AR00027).

In other words, EPA considered whether the net effect of the Motor Vehicle Coatings Measure is an overall reduction in ozone precursor emissions (NOx and VOC emissions, combined). According to EPA, even

though the Measure increases NOx, it makes greater reductions in VOCs, so the "wholistic impact" of the Measure is a net reduction in ozone precursors, and therefore ozone pollution.[10] In EPA's view, because the Measure reduces ozone precursors "in totality," no further analysis of NOx emissions was required of EPA or Colorado. RTC at 10, 11 (AR00026, 27).

This "wholistic impact" calculation could be reasonable when assessing the consequences of the Motor Vehicle Coatings Measure for ozone pollution (if adequately analyzed). Less ozone precursors overall should result in less ozone, even if VOC reductions are offset to a degree by NOx increases.

However, EPA's "wholistic impact" approach runs directly afoul of the text and purpose of Section 110(*l*). When evaluating a SIP revision that targets a particular pollutant of concern, like ozone here, Section 110(*l*) forces EPA and states to answer a question: what implications does the SIP revision have for *other* air pollutants that are not the target of the SIP submittal?

Several provisions of the Act other than Section 110(*l*) ensure that a SIP revision works to reduce the concentration of the specific pollutant the

---

[10] This is by no means the clear effect of the Motor Vehicle Coatings Measure. EPA did not estimate the specific NOx increases resulting from the Measure. Nor did EPA consider whether NOx emissions cause a disproportionate increase in ozone in parts of the Denver area that are "NOx-limited." *See infra* at 56.

revision is meant to target. *E.g.*, 42 U.S.C. § 7410(a)(1); 7502(c)(1), (6). Section 110(*l*), however, as an "anti-backsliding" provision, prevents that SIP revision from causing collateral damage to air quality by, *inter alia*, increasing emissions of other pollutants and interfering with the Clean Air Act requirements that apply to them. 42 U.S.C. § 7410(*l*) (EPA "shall not approve a revision of a plan if the revision would interfere with *any* applicable requirement concerning attainment . . . or *any* other applicable requirement" of the Act (emphasis added)); *see also Kelley v. City of Albuquerque*, 542 F.3d 802, 814 (2008) ("Congress did not add any language limiting the breadth of that word, so 'any' means all").

Thus, "'[a]ttainment' in § 7410(*l*) refers to attainment of any NAAQS, not just the one for which a SIP or SIP revision has been submitted." *Center for Biological Diversity*, 75 F.4th at 177. The same goes for "interfere[ing] with . . . any other applicable requirement" under the Act, including requirements like Clean Air Act increments and visibility. 42 U.S.C. § 7410(*l*).

EPA's "wholistic impact" approach, down to its very foundation, violates the text and purpose of Section 110(*l*).[11] While the Motor Vehicle Coatings

[11] The only support for the "wholistic impact" approach EPA relies on in its Response to Comments is the agency's citation of *Center for Biological Diversity*. RTC at 11, 13 (AR00027, 29) (citing 129 F.4th at 1275). That case contradicts EPA's position. There, this Court reiterated EPA's "longstanding

Measure reduces ozone precursors overall according to EPA's assessment, it increases NOx. RTC at 11, 13 (AR00027, 29). This necessitates additional analysis pursuant to Section 110(*l*) that is concerned with NOx as NOx, not just NOx as an ozone precursor. NOx has an independent NAAQS, 40 C.F.R. § 50.11, and is subject to its own Clean Air Act requirements, including increments and visibility, which Section 110(*l*) requires EPA to consider. 42 U.S.C. § 7410(*l*); 40 C.F.R. pt. 51, App. V, 2.2(d); *see also* RTC at 11 (AR00027).

EPA also regulates NOx as a precursor for fine particulate matter pollution—*see* 89 Fed. Reg. 16,202, 16,214 (Mar. 6, 2024)—and the NOx increases may interfere with the Act's requirements for this pollutant. EPA's "wholistic impact" approach, focusing on ozone alone, could not account for this.

Thus, the Motor Vehicle Contingency Measure is not "SIP-strengthening" with respect to NOx, and accordingly it is necessary for EPA and Colorado to develop "additional information to demonstrate that the NAAQS, prevention

---

position" that emissions increases typically require further analysis, or substituted emissions reductions, to satisfy Section 110(*l*), not anything resembling a consideration of "wholistic impact." 129 F.4th at 1275.

of significant deterioration increments . . . and visibility are protected if the plan is approved." RTC at 11 (AR00027).

Accordingly, EPA's "wholistic impact" determination violated Section 110(*l*) and EPA failed consider several important aspects of the problem of increased NOx emissions.[12] *See State Farm*, 463 U.S. at 43; 5 U.S.C. § 706(2)(A), (C) (action contrary to law and statute unlawful); *see also Hall v. EPA*, 273 F.3d 1146, 1155–56, 1160–61 (9th Cir. 2001).

---

[12] In *Center for Biological Diversity v. EPA*, the Center also raised this issue. 75 F.4th at 183. The Third Circuit did not reach it because of a procedural issue, but stated in dicta that:

> We cannot, however, ignore the agency's admission of error . . . EPA admits that it approved the use of a thermal oxidizer at Roystone to limit VOC emissions that does increase NOx emissions, even though the agency's approval stated that there were no NOx emissions. This error is undoubtedly concerning. The EPA's thorough identification and consideration of each air quality variable implicated by a given SIP revision is a key prerequisite of a reasonable § 7410(l) analysis—otherwise, it cannot accurately ascertain whether the revision will 'interfere with . . . [NAAQS] attainment,' as the statute requires. An emissions-based assessment that accounts only for the emissions being controlled by the relevant technology and not for the emissions being released by the control process itself could indicate that the agency may have 'entirely failed to consider an important aspect of the problem.'

75 F.4th at 184 n.6 (quoting *State Farm*, 463 U.S. at 43).

### B. EPA failed to consider several important aspects of the problem resulting from the NOx increases in its application of the "wholistic impact" approach.

In applying its "wholistic impact" approach, EPA also arbitrarily failed to connect the facts to its conclusion that Motor Vehicle Coatings Measure complied with Section 110(*l*). *Burlington Truck Lines*, 371 U.S. at 168; *State Farm*, 463 U.S. at 43.

Pursuant to the Act's cooperative federalism scheme, states "have the primary responsibility for assuring air quality" and formulating SIPs. 42 U.S.C. § 7407(a). This is far from a formality. States have experience with local air quality conditions, affected sources, and the impacted environment.[13] EPA's limited discussion of the NOx increases underscores the need for this experience.

EPA based its "wholistic impact" assessment of NOx and VOC emissions on general assumptions about the potential use of control devices by facilities affected by the Motor Vehicle Coatings Measure. RTC at 11 (AR00027). EPA

---

[13] EPA's regulations require that state "[SIP] submissions for review by EPA," like Colorado's contingency measure submission, must include "[t]he State's demonstration that the national ambient air quality standards, prevention of significant deterioration increments, reasonable further progress demonstration, and visibility, as applicable, are protected if the plan is approved and implemented." 40 C.F.R. pt. 51, App. V, 2.2(d). The SIP revisions submitted by Colorado do not contain any such demonstration, and EPA did not require it.

referenced materials that are not specific to the automative coatings industry, the Denver area (or even Colorado), or the Motor Vehicle Coatings Measure. RTC at 11–14 (AR00027–30). EPA did not estimate the increase in emissions of NOx or determine where these emissions might occur. *Id*.

Nor did EPA consider where the Denver area's ozone problem might be "limited" by NOx pollution. Because ozone results from the two precursors of VOCs and NOx, in areas where VOCs concentrations are high but NOx concentrations are low, adding emissions of NOx to the equation can cause a disproportionate increase in ozone. *See Border Power Plant Working Group v. DOE*, 260 F. Supp. 2d 997, 1021 (S.D. Cal. 2003) (explaining that the federal agency defendants identified that in "rural areas," ozone "does generally tend to be NOx-limited (i.e., adding more NOx increases ozone)"). EPA did not consider this important aspect of the problem, even though the Motor Vehicle Coatings Measure may exacerbate the ozone problem in certain areas.

EPA also dismissed the potential for violations of the NAAQS for NOx based on air monitoring data. RTC at 13 (AR00029). NOx, however, typically only travels short distances before depositing on land or water, or converting into other compounds like ozone. 89 Fed. Reg. 105,692, 105,703 (Dec. 27, 2024). Thus, NOx monitoring especially suffers from a "problem inherent in the monitoring process, namely, that a monitor only measures air quality in its

immediate vicinity." *Catawba*, 571 F.3d at 30. Monitoring data provides a poor representation of whether the NAAQS for NOx are being violated in any given location, which typically requires more elaborate air-quality analysis. *See* 40 C.F.R. pt. 51, App. V, 2.2(d). EPA failed to consider this. Further, the record contains evidence of violations of the NOx NAAQS in the Denver area, based on EPA computer modeling methods and State of Colorado data. AR00398–408.

Additionally, EPA failed to consider whether automative coating facilities might be located where background concentrations of NOx are high, like near a highway. Given the NAAQS of 100 parts per billion, if background concentrations are already 99 parts per billion, an increase in only two additional parts per billion would result in a violation. EPA also failed to consider whether the increased NOx emissions interfere with the Act's requirements for fine particulate matter, where it regulates NOx as a precursor to this pollutant. 89 Fed. Reg. at 16,214.

EPA's "wholistic impact" approach fails to consider several important problems deriving from the NOx increase and improperly departs from the text and purpose of Section 110(*l*), as well as the agency's own longstanding position that emissions increases implicate Section 110(*l*).

## III. Sections 172(c)(9) and 182(c)(9) do not condone a contingency measure that provides *de minimis* emissions reductions.

The Motor Vehicle Coatings Measure provides *de minimis* VOC emissions reductions and increases NOx pollution. The plain language of Sections 172(c)(9) and 182(c)(9) require much more. 42 U.S.C. §§ 7502(c)(9), 7511a(c)(9). As a matter of "statutory interpretation[,] the ancient principle that the law does not care about trifles" applies to the Clean Air Act. *Comm. for a Better Arvin v. EPA*, 786 F.3d 1169, 1178 (9th Cir. 2015) (citing *Skaff v. Meridien N. Am. Beverly Hills, LLC*, 506 F.3d 832, 839–40 (9th Cir. 2007)).

Congress intended Sections 172(c)(9) and 182(c)(9) to require contingency measures that achieve meaningful emissions reductions adequate to address shortfalls in achieving reasonable further progress, attaining the NAAQS, or meeting milestones. Accordingly, the best reading of the statute mandates more than *de minimis* emissions reductions. Yet EPA approved Colorado's infeasibility justification, signing off on a contingency measure that provides scant VOC reductions while increasing NOx. EPA cannot interpret and apply the Act in a manner that diminishes the statutory obligation to nil. *See Comm. for a Better Arvin*, 786 F.3d at 1178 (the Clean Air Act does not care about trifles).

As discussed above, the Motor Vehicle Coatings Measure reduces VOC emissions by a scant 0.54 tons per day when at least 14.2 tons per day of VOC reductions are required. Proposed Rule at 19,452, 19,454 (AR00006, 8). This is less than four percent of the required VOC reductions, and only two percent of the required reductions in ozone precursors. *Id*. And that does not account for the increase in NOx pollution, which EPA and Colorado failed to estimate.

As another point of comparison, the emissions reductions here are less than emissions reductions that EPA itself previously insisted were *de minimis*. In *Committee for a Better Arvin v. EPA*, community groups challenged EPA's decision to not approve pollution reduction measures into California's SIP. 786 F.3d at 1177–78. EPA argued that it properly omitted the measures because "it determined that [the measures] produced only *de minimis* emission reductions and so did not affect EPA's overall attainment and reasonable further progress evaluations." *Id*. at 1178. Accepting EPA's position that the rules only provided "trifling emission control measures," the Ninth Circuit upheld EPA's decision. *Id*.

Those measures would have reduced 0.62 tons per day of NOx pollution in the relevant nonattainment area. 76 Fed. Reg. 69,896, 69,908 (Nov. 9, 2011). Here, EPA and Colorado estimate even lower reductions of VOCs of only 0.54 tons per day, with NOx pollution increasing. RTC at 11, 13

(AR00027, 29). These *de minimis* reductions simply do not meet the Section 172(c)(9) and Section 182(c)(9) requirement to adopt contingency measures.

## IV. Remedy

The appropriate remedy in this case is remand of EPA's approval of the ozone contingency measures without vacatur, but with a specific deadline by which EPA must act on remand. While vacatur is the presumptive remedy where, as here, a federal agency acted arbitrarily and contrary to law, *Eagle Cnty. v. Surface Transp. Bd*., 82 F.4th 1152, 1196 (D.C. Cir. 2023), and the Motor Vehicle Coatings Measure achieves *de minimis* emissions reductions, there is no material value to vacatur.

Remand without vacatur, however, divorces EPA and Colorado's responsibility to finalize meaningful contingency measures from clear Clean Air Act deadlines that govern SIP revisions. This raises the real possibility of agency delay. "Experience suggests that remand without vacatur sometimes invites agency indifference." *Cemex Inc. v. DOI*, 560 F. Supp. 268, 282 n.8 (D.D.C. 2021).[14]

[14] *See also NRDC v. EPA,* 489 F.3d 1250, 1264 (D.C. Cir. 2007) (Randolph, J., concurring) ("A remand-only disposition is, in effect, an indefinite stay of the effectiveness of the court's decision and agencies naturally treat it as such."); *Am. Great Lakes Ports Ass'n v. Schultz*, 962 F.3d 510, 519 (D.C. Cir. 2020).

For these reasons, if the Court does remand without vacatur, the Public Interest Groups respectfully request that the Court impose a 90-day deadline for EPA to respond to the remand order with a partial disapproval—*see* 42 U.S.C. § 7410(k)(3)—of the SIP submittal. *See, e.g.*, *In re Core Commc'ns, Inc.*, 531 F.3d 849, 861–62 (D.C. Cir. 2008) (Griffith, J., concurring) (ordering agency to respond to remand order within 90 days and ordering the rules vacated unless the agency notifies the court that it complied with the court's order before that date); *Rodway v. U.S. Dep't of Agriculture*, 514 F.2d 809, 817–18 (D.C. Cir. 1975) (requiring agency "to complete new rule-making process within 120 days of the issuance of this opinion").

It will be the public that bears the burden of unhealthy levels of ozone pollution if EPA's approval is allowed to stand, or if EPA action on remand is delayed.

## CONCLUSION

For the reasons stated above, the Court should grant the Public Interest Groups' petition and remand EPA's determination that Colorado satisfied the Clean Air Act's contingency measures requirement.

## ORAL ARGUMENT STATEMENT

The Public Interest Groups submit that oral argument would be useful in this matter because the case presents questions of first impression, and it is relatively rare that Clean Air Act cases are litigated in this Court.

Dated: September 18, 2026

Respectfully submitted,

*/s/ Ryan Maher*

Ryan Maher
Center for Biological Diversity
1411 K St. NW, Ste. 1300
Washington, DC 20005
781-325-6303
rmaher@biologicaldiversity.org

*/s/ Benjamin Rankin (w/ permission)*

Benjamin Rankin
Center for Biological Diversity
1411 K St. NW, Ste. 1300
Washington, DC 20005
202-849-8402
brankin@biologicaldiversity.org

*Counsel for Petitioners Center for Biological Diversity and Sierra Club*

## CERTIFICATE OF SERVICE

I certify that on September 18, 2026, I electronically filed the foregoing PETITIONERS' OPENING BRIEF with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all Counsel of Record.

## CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that with respect to the foregoing:

(1) All required privacy redactions have been made per 10th Cir. R. 25.5;

(2) If required to file additional hard copies, that the ECF submission is an exact copy of those documents;

(3) The digital submissions have been scanned for viruses with the most recent version of a commercial virus scanning program, Emsisoft Anti-Malware, Version 2024.12.0.12633 (updated July 24, 2026), and according to the program are free of viruses.

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

This document complies with the type-volume limitation and word limit of Fed. R. App. P. 32(a)(7)(B)(i) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) and 10th Cir. R. 32(B), this document contains 12,522 words. Furthermore, this document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and 10th Cir. R. 32(A) and the type-style requirements of Fed. R. App. P. 32(a)(6), because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Cambria font.

Dated: September 18, 2026

*/s/ Ryan Maher*________________

Ryan Maher
Center for Biological Diversity
1411 K St. NW, Ste. 1300
Washington, DC 20005
781-325-6303
rmaher@biologicaldiversity.org

*Counsel for Petitioners Center for Biological Diversity and Sierra Club*